UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09c49

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| HECTOR HERNANDEZ GONZALEZ | ) | |

**THIS MATTER** is before the Court upon the defendant's Motion to Suppress (Doc. No. 8), the government's Response (Doc. No. 9), and the government's second Response (Doc. No. 10). The Court held an evidentiary hearing June 9, 2009, and took the motion under advisement. For the reasons that follow, the Motion to Suppress will be denied.

I.   FACTUAL FINDINGS

On March 10, 2009, Maria Angela Gonzalez Mireles[1] arrived on a flight from Mexico at Charlotte Douglas International Airport. She was accompanied by two children. After disembarking the airplane, Mireles approached the primary inspection area used to screen passengers on international flights. Customs and Border Patrol ("CBP") Officer Jack Lanier determined that Mireles was a Mexican national with a tourist visa and that the children were United States citizens. Officer Lanier directed Mireles to a secondary inspection area to assess whether the children were traveling with parental consent.[2]

There CBP Officer Thomas Weeks questioned Mireles in Spanish while CBP Officer John Holloman observed. Officer Weeks understood Mireles to say that she was bringing her

---

[1]  Mireles is the defendant's mother.

[2]  The parents are the defendant's sister and brother-in-law.

grandchildren back to the United States, that their parents were not U.S. citizens, and that their parents were illegally in the country.[3] Officer Holloman left the secondary inspection area to see if they were waiting to pick up Mireles and the children. Officer Holloman did not see anyone in the immediate area who appeared to be waiting on anyone. Down the corridor near the baggage area he saw two Hispanic males and a Caucasian female[4] who kept looking toward the federal inspection station. He approached them and learned they were waiting for Mireles and the children.

Officer Holloman asked the children's father, Hernan Monroy, if he would be willing to go to the inspection station to interpret for Mireles as they determined how long she would be in the country and whether she had a true relationship with the children.[5] Monroy agreed and subsequently admitted he was in the country illegally. At the inspection station, officers asked Monroy about the name and status of the other male, the defendant, but Monroy only told them the defendant's name. After they ran a computer check that returned a statement, Officer Holloman left to speak to the defendant to confirm that the queried name was in fact the his.

---

[3] Officer Weeks's testimony conflicts with that of Mirales, who testified by telephone from Mexico that she said she did not know whether the children's father was in the country legally. The Court observed the demeanor of Officer Weeks during his in-court testimony and finds him to be a credible witness. He had a clear recollection of the events and the subsequent actions of officers were consistent with receiving information that the children's father was in the country illegally.

[4] They were the defendant; his brother-in-law, Hernan Monroy; and his former neighbor, Pasty Herring.

[5] Officer Weeks's chronology differs from Officer Hollman's regarding the timing of when they learned of Monroy's and the defendant's alien status. Officer Hollman's account that he first walked Monroy back to the inspection station and later returned to speak with the defendant is consistent with the testimony of Patsy Herring and the defendant. Officer Weeks indicated Monroy and the defendant came back at the same time.

2

Officer Hollomon approached the defendant and requested his identification, which matched the queried name. While holding the defendant's driver's license, Officer Holloman asked for his green card and citizenship papers. The defendant responded that he did not have any, then Officer Holloman called Officer Weeks and told him that the defendant was in the country illegally. Officer Weeks directed Officer Holloman to bring the defendant to the inspection station for the issuance of a Notice to Appear before an immigration judge.

Officer Holloman asked the defendant to return to the inspection station to talk and take care of paperwork after which he would be able to complete his trip. While they were walking, the defendant asked what the situation was about. Officer Holloman responded that he thought the defendant had been in the country "a little bit too long." To the officer's surprise, the defendant admitted being in the country for nineteen years.

Officer Weeks ran the defendant's and Monroy's names in the Immigration and Naturalization Service Central Index System and the Treasury Enforcement Communications System. The search was negative for Monroy, but revealed the defendant had been deported in 1991.[6] Officer Weeks then ran the defendant's fingerprints through the Integrated Automated Fingerprint Identification System, revealing a prior arrest. After issuing Monroy a Notice to Appear and releasing him, Officer Weeks informed the defendant he was under arrest for a violation of Title 8 of the United States Code and moved him to an interview room. Officer Weeks read the defendant his <u>Miranda</u> rights and asked him if he was willing to talk without a lawyer. After the defendant said he wanted to explain the situation and signed a rights-waiver

---

[6] Officer Weeks testified that the defendant admitted being deported, but the defendant testified that he said he did not remember being deported. Resolution of this difference is not material to the issues presented.

form. Officer Weeks wrote out the defendant's statement, which the defendant swore was accurate.

II. DISCUSSION

   A. No Fourth Amendment Violation

Immigration officers are authorized to question aliens, or those believed to be aliens, regarding their right to be in the United States. 8 U.S.C. § 1357(a)(1). However, that authority is circumscribed by the Fourth Amendment and officers may not seize persons without reasonable suspicion. United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). Yet, not every encounter between law enforcement and individuals amounts to a seizure or stop under the Fourth Amendment. The Supreme Court has consistently recognized that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991).

Instead, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." INS v. Delgado, 466 U.S. 210, 216 (1984). Such a consensual encounter may transform into a seizure when the circumstances become "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave." Id. This inquiry involves an objective examination of the totality of the circumstances and includes consideration of

> the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen.

United States v. Weaver, 282 F.3d 302, 310 (4th Cir. 2002). The retention of a person's

identification is highly material under this analysis, but no one factor is dispositive. Id. In fact, the Fourth Circuit has recognized that individuals can exercise the choice to walk away without their identification, Id. at 311-312, or request its return, United States v. Henderson, No. 95-5125, 1996 WL 251370, at *2 (4th Cir. May 14, 1996).

Here, Officer Holloman first approached the defendant, Monroy, and Herring around 6:20 p.m. in the public waiting area of the airport to locate the parents of the children traveling with Mireles. His second approach was a short time later in the same area to confirm the defendant's name after the computer search returned a statement. Although Officer Holloman requested the defendant's identification and briefly retained it, his questions were limited to determining the defendant's identity and alien status. Officer Holloman was wearing a uniform, badge, and gun, but neither the defendant nor Herring described any threatening or intimidating behavior by him. Accordingly, the Court finds the encounter was consensual at the point when the defendant first admitted he was in the country illegally and the Fourth Amendment was not violated by the officer's actions. The additional investigation was justified by reasonable suspicion and the defendant was subsequently arrested with probable cause, as detailed below.

B. No Fifth Amendment Violation

The defendant asserts that his Fifth Amendment rights were violated because all of his statements were made while he was "in custody," but he was not warned of his Miranda[7] rights until late in the encounter. An officer may temporarily detain a person that he reasonably believes is involved in criminal activity, Terry v. Ohio, 392 U.S. 1, 30 (1968), and ask a limited number of questions without giving Miranda warnings, Berkemer v. McCarty, 468 U.S. 420,

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

439-40 (1984). Miranda warnings are required when, under the totality of the circumstances, the individual's "freedom of action is curtailed to a degree associated with formal arrest." Id. at 440.

To admit statements made by a person while in custody, the government must show that he was advised of his right against self-incrimination and his right to counsel. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Additionally, a court must consider the totality of the circumstances to determine whether the person understood his rights and exercised an uncoerced choice to waive them. Moran v. Burbine, 475 U.S. 412, 421 (1986). The totality of the circumstances includes the setting in which the statement was obtained, details of the interrogation, and characteristics of the accused. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The ultimate question is whether "the defendant's will has been overborne or his capacity for self-determination critically impaired." United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (internal quotation marks and citations omitted).

As discussed above, the defendant's first admission that he was not a citizen and that he did not have a green card occurred during a consensual encounter with Officer Holloman in a public area of the airport without any show of force by the officer. Accordingly, Court finds that the defendant was not in custody or its functional equivalent and his initial statement will not be suppressed.

After Officer Holloman reported that the defendant was illegally in the country, Officer Weeks directed that the defendant be brought to the inspection station for the issuance of a Notice to Appear. However, this movement did not transform the encounter into a custodial situation. Officer Holloman asked the defendant to come with him in order to complete paperwork and advised him that he would be free to leave after that. Although the defendant

testified that he did not feel free to leave when he was walking with the officer, they were in a public place, the defendant was not in handcuffs, and no force was used to gain his compliance. When the defendant asked what the situation was about, Officer Holloman responded that he thought the defendant had been in the country too long. Therefore, the defendant's voluntary response to the officer's remark was not the result of custodial interrogation and will not be suppressed.

Officer Holloman walked with the defendant to the inspection station where his mother and nephew were waiting. Officer Weeks ran the defendant's name and date of birth in two computer systems which returned records causing him to suspect that the defendant had been deported. His question about that information and the defendant's affirmative response were made in a place with the defendant's relatives nearby. The defendant had not been told he was under arrest and he still was not in handcuffs. Thus, in this close case, the Court finds, after an examination of the totality of circumstances, defendant's admission that he had been deported before was not made while in custody for purposes of <u>Miranda</u>. See <u>United States v. Parker</u>, 262 F.3d 415, 419 (4th Cir. 2001) (suspect not functionally arrested where questioned in the presence of her family, among other factors).

The subsequent fingerprint match established probable cause for Officer Weeks to arrest the defendant for a criminal violation of Title 8 of the United States Code. At that time, Officer Weeks moved the defendant into an interview room and advised him of his <u>Miranda</u> rights. The defendant said he was willing to explain the situation and executed a document stating he understood his rights. His subsequent statement was reduced to writing which the defendant reviewed and swore was accurate. The defendant did not testify that he did not understand his

7

rights nor did he describe any conduct by the officers to coerce his statement. Accordingly, the Court finds that when the defendant was arrested, he was properly advised of his rights, and knowingly and voluntarily waived them. Therefore, his oral post-arrest statement and adopted written statement will not be suppressed.

III. CONCLUSION

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to Suppress (Doc. No. 8) be **DENIED**.

The Clerk is directed to certify copies of this Order to defendant, defense counsel, and the United States Attorney.

Signed: October 5, 2009

Robert J. Conrad, Jr.
Chief United States District Judge